[Cite as *State v. Watson*, 2023-Ohio-3137.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
| | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellee | : | Hon. Andrew J. King, J. |
| | : | |
| -vs- | : | |
| | : | Case No. 2022CA00145 |
| CORTEZ WENDALL WATSON | : | |
| | : | |
| Defendant-Appellant | : | OPINION |


CHARACTER OF PROCEEDING:     Appeal from the Stark County Court of
                             Common Pleas, Case No. 22CR1420A


JUDGMENT:                    Affirmed


DATE OF JUDGMENT ENTRY:      September 6, 2023


APPEARANCES:

For Plaintiff-Appellee                 For Defendant-Appellant

KYLE STONE                             KATHLEEN O. TATARSKY
Prosecuting Attorney                   236 Third Street S.W.
By: VICKI L. DESANTIS                  Suite 100 Carnegie Building
110 Central Plaza South, Ste. 510      Canton, OH 44702
Canton, OH  44702

*Gwin, P.J.*

{¶1} Defendant-appellant Cortez Wendell Watson ["Watson"] appeals his convictions and sentences after a jury trial in the Stark County Court of Common Pleas.

*Facts and Procedural History*

{¶2} On June 27, 2022, Watson was arrested and charged with murder, felonious assault and having weapons while under disability for the shooting death of T.B. at the Rodeway Inn in Jackson Township, Stark County, Ohio the night before. On July 7, 2022, after a preliminary hearing in the Massillon Municipal Court, Watson's case was bound over to the Stark County Grand Jury. On July 15, 2022, Watson's retained counsel filed a Notice of Appearance with the Stark County Court of Common Pleas. [Docket Entry No. 1].

{¶3} On September 1, 2022, the Stark County Grand Jury returned an Indictment charging Watson with Murder [felony murder], a violation of R. C. 2903.02(B)(D), an unclassified felony, Felonious Assault, a violation of R.C. 2903.11(A)(D)(1)(a), a felony of the second degree, Having Weapons While under Disability, a violation of R.C. 2923.13(A)(3)(B), a felony of the third degree and Tampering With Evidence, a violation of R.C. 2921.12(A)(1)(B), a felony of the third degree. Both the murder charge and the felonious assault charge contained firearm specifications, R. C. 2941.145(A).

{¶4} Watson did not waive his speedy trial rights. On September 6, 2022, Watson filed a Demand for Discovery and a Notice of Intention to Use Evidence. [Docket Entry No. 8]. The state filed a Bill of Particulars on September 9, 2022. [Docket Entry No. 11]. Trial was scheduled for September 26, 2022. [Docket Entry No. 15].

{¶5}    Watson filed his witness list on September 21, 2022, listing four potential witnesses.  [Docket Entry No. 25].  An updated witness list listing five potential witnesses was filed by Watson on September 23, 2022.  [Docket Entry No. 27].  On September 23, 2022, the state filed a motion in limine asking to exclude from trial the use of alleged other bad acts of the decedent.  [Docket Entry No. 28].  A notice of appearance as co-counsel was filed by Watson on September 26, 2022 listing attorney Gaitanos as co-counsel for attorney Shamansky.

{¶6}    Watson's jury trial began on September 26, 2022.

## Shot Fired at Rodeway Inn

{¶7}    On June 26, 2022, Jackson Township Police Officer Jeffrey Aynes was patrolling the Best Western Motel on Sunset Strip.  Around 11:25 pm, he heard a loud pop.  Around the same time, he received a dispatch call to the Rodeway Inn, across the street from the Best Western for a "male in the parking lot laying down bleeding." 2T. at 41[1].

{¶8}    Officer Aynes drove to the front of the Rodeway building and saw a group of people grilling in front of a room in no apparent distress. Id. at 42.  Officer Aynes drove to the back of the building where he saw two males--one a hotel staff person--standing over the man on the ground. Id. 42; State's Exhibit 2.  Officer Aynes put his protective gloves on, got his medical kit and went to the male to render aid. Id. at 43.  The male had a weak pulse, was foaming at the mouth and Aynes saw wounds on the male's wrist and chest.  The male was shirtless, wearing blue jeans and black Nike briefs.  State's Exhibit

---

[1] For clarity, the transcript from Watson's jury trial will be referred to as, "__T.__," signifying the volume and the page number.

2.  The medics arrived, took control of the male's care and Officer Aynes went with the motel manager to look at surveillance videos.  Id. at 45.

**{¶9}**   The videos reviewed by Officer Ayers showed the shirtless male running from the front of the building to the back losing blood and his flip flops.  2T. at 48; State's Exhibit 1H; State's Exhibit 3.  The video also showed a black male wearing a black shirt with a Black Fist logo on the back, camouflage long shorts, tennis shoes and a Cleveland Browns ball cap pull a handgun from his waistband and shoot the shirtless male.  State's Exhibit 1U; State's Exhibit 3.

### Cortez Watson identified as shooter

**{¶10}**  Jackson Township Detective Dustin McDannold, the lead investigator, arrived at the scene around 1:00 am, June 27, 2022.  2T. at 116.  He learned that the male found on the ground with wounds to his arm and chest had died.  He talked to the patrol officers on the scene and viewed the Rodeway Inn videotapes that covered the entire property.  He learned from the videos that a shooting occurred outside Room 215 at 11:28 p.m.  2T. at 118-119; State's Exhibit 3.  He also viewed a videotape from the Benjamin Transportation Service that showed the male and a woman in the back seat leaving the Best Western Motel parking lot.  State's Exhibit 12.

**{¶11}**  Further investigation through a law enforcement database that matched phone numbers with names revealed that Benjamin Transportation was called by K.C., Watson's girlfriend, for a pickup at the Rodeway Inn.  2T. at 48-50; State's Exhibit 3.  The pick-up spot was later changed to the Best Western across the street.  Id. at 120.  That same database matched the Benjamin Transportation drop off point as an address on Plain Avenue belonging to the mother of Watson.  Id. at 120-121.

{¶12} Detectives identified the shooting victim as T.B. through the LEADS database. 2T. at 55. Further investigation revealed that T.B. and his girlfriend had rented Room 309 that evening. No weapons were found in Room 309 or on the body of T.B. 2T. at 98, 106.

{¶13} Detective Dustin McDannold positively identified Watson from the LEADS license photo compared to the security footage. Id. 122. Detective McDannold testified that he could see T.B. walking and talking to Watson on the video. Id. at 144; State's Exhibit 3. Detective McDannold testified that T.B. did not have anything in his hands. Id. 145. He further testified that he could see Watson advance upon T.B. Id. at 145. It appears T.B. is speaking with his hands. Id. at 144, 145. Watson can be seen going around the car towards T.B. and discharging a firearm at T.B., who is backing up at that point. Id. The entire interaction was less than ten seconds. Id. at 145. There was no audio on the videos at the motel. Id. at 150.

### The autopsy

{¶14} Dr. David Dolinak, a forensic pathologist with the Cuyahoga County Coroner's office, performed an autopsy on the body of T.B. on June 27, 2022. He found a gunshot wound that went through his right forearm, through his mid chest and the left forearm. 2T. at 205. There was no exit wound and an orange colored polymer bullet was recovered from the body and entered into evidence. State's Exhibit 6. Dr. Dolinak opined that T.B. died from gunshot wounds.

{¶15} During the autopsy blood and urine specimens were taken from T.B.'s body and toxicology tests were done. Several drugs were found in his system including

methamphetamine, amphetamine, fentanyl, marijuana, norfentanyl and acetyl fentanyl. State's Exhibit 15.

### Watson testifies at trial

{¶16} Watson testified that he knew T.B. through A.M., the woman T.B. was with at the Roadway Inn on June 26. Watson knew T.B. as "T.J.". 3T. at 58. He knew him as a violent man with "high powered drug use." Id. at 58. Watson testified that two weeks prior, T.B. pulled up in a car to a party where Watson was and pulled out a black firearm. Id. at 61. Watson further testified that about a week after that incident, T.B. pulled up in a car and fired a gun two times while Watson was sitting on the porch. Id. at 65.

{¶17} Watson testified that on June 26, 2022, he was with his girlfriend, K.C. at the Rodeway to party and barbeque with his friends. K.C. rented a room and Watson was drinking some beers with his friends.

{¶18} Watson testified that he saw T.B. talking loudly with his girlfriend, agitated, moving his hands in the air. *See,* State's Exhibit 3. Then, T.B. started walking behind Watson who had joined the partygoers by the barbeque grill. Id. T.B. can be seen in the security video appearing almost 30 seconds after Watson had walked past the same location. State's Exhibit 3. Watson can be seen talking and drinking outside the motel room with his girlfriend and another male, while a third man is tending to a charcoal grill at 11:27:26 p.m. T.B. first appears in the video walking toward the group at 11:28:11 p.m. T.B. stops at the front of an automobile and speaks with Watson at 11:28:24 p.m. Watson begins advancing and T.B. begins backing up at 11:28.31. Watson fires his gun at T.B. at 11:28:33 p.m.

{¶19} Watson testified to the encounter at trial. Remembering their past interactions, Watson was scared. Watson testified that T.B. said something to him,

> I can't understand what he's saying. I turn. I say what? What? Are
>
> you talking to me? And he said you can't run now bitch ass N---, I'm going
>
> to kill you.

3T. at 72. Watson testified that he was extremely frightened and scared. This was the closest T.B. had ever been to him and he knew he was coming to threaten him. 3T. at 74. Watson testified he was nervous when T.B. started moving his hands and when he said those words, he just reacted. Id. at 78. Watson testified that T.B. was "reaching toward his pocket." Id. at 92. However, Watson admitted T.B. had his hands up and he did not see any weapon. Id.at 92-93. Watson testified, "I fire one shot, he turns and runs." 3T. at 76. Watson saw T.B. run off and did not think T.B. was hit by the bullet. Watson testified that he did not pursue him. Id. at 77. He was just glad that he was gone from the area.

Rodeway security video show T.B. running and collapsing onto the ground at 11:28 p.m. State's Exhibit 3. The videos show Watson remain with the people by the barbeque grill with a cup and cigarette in his hand. State's Exhibit 3.

Watson testified that he saw the police, got scared because he knew he could not have a firearm, panicked, and ran. 3T. at 82. Watson and his girlfriend can be seen walking toward the Best Western motel at 11:36 p.m. State's Exhibit 3. Watson can be seen waiting with his girlfriend to catch a cab at the Best Western motel at 11:40 p.m. State's Exhibit 11. Watson is then seen ducking down inside the cab as it pulls away from the scene at 11:55 p.m. State's Exhibit 12.

{¶20} J.J. proffered his testimony.  3T. at 106-117.  J.J. did not know T.B. personally, but knew of him.  Id. at 107.  J.J. testified that T.B. had been accused of "cutting parts off of my friend's car…" 3T. at 107.  The friend and T.B. exchanged words over the accusation.  Id.  A week later T.B. pulled over to another friend's house and brandished a pistol out of the car window.  Id. Watson was present when this incident occurred.  Id.  A week after that, T.B. pulled up and actually fired the gun in their direction.  Id. at 108.  J.J. testified that he never saw T.B. outside of those two incidents.  Id. at 110.  Because J.J. did not know him, Watson told J.J. that the individual with the gun was T.B.  Id. at 113.  J.J. was not present for the current shooting.

{¶21} After hearing the evidence, viewing several videotapes, and receiving instructions from the trial court, the jury began its deliberations.  It returned with a unanimous verdict of guilty to all charges in the indictment.

{¶22}  Watson returned to the trial court for sentencing on October 5, 2022.  The trial court accepted the jury's verdict and sentenced Watson to fifteen years to life for murder, three years on the gun specification, three years for having weapons under disability and two years for tampering with evidence.  The trial court merged the felonious assault conviction with the murder conviction.  Watson's aggregate prison sentence is twenty- three years to life.

*Assignments of Error*

{¶23}  Watson raises four Assignments of Error,

{¶24} "I.  DEFENDANT-APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION  OF  HIS  RIGHTS  UNDER  THE FIFTH,  SIXTH  AND  FOURTEENTH  AMENDMENTS  TO  THE  UNITED  STATES

CONSTITUTION AND SECTION 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

**{¶25}** "II. THE WEIGHT OF THE EVIDENCE DOES NOT SUPPORT THE CONVICTION OF MURDER WHEN THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT DEFENDANT-APPELLANT DID NOT ACT IN SELF DEFENSE.

**{¶26}** "III. DEFENDANT-APPELLANT'S CONVICTION FOR TAMPERING WITH EVIDENCE WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

**{¶27}** "IV. DEFENDANT-APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A COMPLETE DEFENSE WHEN THE TRIAL COURT EXCLUDED THE TESTIMONY OF [J.J.]."

I.

**{¶28}** In his First Assignment of Error, Watson argues that Defense counsel's performance prior to trial, during the trial and after the trial was deficient. Watson presents several areas in which he contends his trial counsel was deficient and further argues any one and the accumulation of his tactics or lack of them warrants a reversal of appellant's convictions and a new trial.

**STANDARD OF APPELLATE REVIEW.**

**{¶29}** To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding.

*Strickland v. Washington*, 466 U.S. 668, 687–688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693(1984).  A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other.  *Strickland* at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699; *State v. Madrigal*, 87 Ohio St.3d 378, 2000-Ohio-448, 721 N.E.2d 52 (2000).

### Failure to waive speedy trial rights

**{¶30}** Watson first posits that his trial counsel did not have sufficient time to prepare to defend him at trial and, therefore, he should have waived Watson's right to a speedy trial.

**{¶31}**   Watson was arrested on June 28, 2022 and remained in jail throughout the case.  On July 7, 2022, after a preliminary hearing in the Massillon Municipal Court, Watson's case was bound over to the Stark County Grand Jury.  Retained counsel filed a Notice of Appearance on Watson's behalf in his case in the Stark County Court of Common Pleas on July 15, 2022.  [Docket Entry No. 1].  The jury trial began on September 26, 2022.  Thus, counsel was representing Watson at least seventy-three days prior to the start of trial.

**{¶32}**  In *State v. Ramey,* the Ohio Supreme Court summarized the applicable law concerning speedy trial,

The right to a speedy trial is a fundamental right of a criminal defendant that is guaranteed by the United States and Ohio Constitutions. Sixth Amendment to the U.S. Constitution; Ohio Constitution, Article I, Section 10.  *See also State v. Hughes*, 86 Ohio St.3d 424, 425, 715 N.E.2d 540 (1999).  States have the authority to prescribe reasonable periods in which a trial must be held that are consistent with constitutional

requirements. *Barker v. Wingo*, 407 U.S. 514, 523, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). "In response to this authority, Ohio enacted R.C. 2945.71, which designates specific time requirements for the state to bring an accused to trial." *Hughes* at 425, 715 N.E.2d 540. The prosecution and the trial courts have a mandatory duty to try an accused within the time frame provided by the statute. *State v. Singer*, 50 Ohio St.2d 103, 105, 362 N.E.2d 1216 (1977); *see also State v. Cutcher*, 56 Ohio St.2d 383, 384, 384 N.E.2d 275 (1978). Strict compliance with the statute is required. *State v. Davis*, 46 Ohio St.2d 444, 448, 349 N.E.2d 315 (1976).

A defendant charged with a felony "[s]hall be brought to trial within two hundred seventy days after the person's arrest." R.C. 2945.71(C)(2). For purposes of calculating speedy-trial time, "each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.71(E). Thus, subject to certain tolling events, a jailed defendant must be tried within 90 days. Id.

132 Ohio St.3d 309, 2021-Ohio-2904, 971 N.E.2d 937, ¶¶14-15. Thus, the legislature has deemed ninety days in which to bring an incarcerated individual to trial to be reasonable. A longer period "threatens to produce more than one sort of harm, including 'oppressive pre-trial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence." *Doggett v. United States*, 505 U.S. 647,654, 112 S.Ct. 2686, 120 L.Ed.2d 520(1992), *quoting Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In this case, retained counsel had seventy-three days during which

he filed for discovery and filed two witness lists. Co-counsel was also present during pretrial conferences and at trial.

**{¶33}** Thus, we do not find under the facts presented here that the mere failure to waive Watson's constitutional and statutory rights to a speedy trial in and of itself fell below an objective standard of reasonableness, and prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding.

### Failure to cross-examine

**{¶34}** Watson next argues that his counsel's failure to cross-examine the coroner who perform the autopsy amounted to ineffective assistance of counsel. Specifically, Watson argues that the toxicology report on T.B. showed the prolific number of drugs in his system including significant amounts of amphetamine and methamphetamine. Watson contends that several scientific studies have demonstrated that violent behavior increases during periods of methamphetamine use, and suggests his counsel should have cross-examined the coroner on this subject.

**{¶35}** The scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45; *State v. Campbell*, 90 Ohio St.3d 320, 339, 738 N.E.2d 1178 (2000). In addition, to fairly assess counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶36}** Nothing in the record establishes that the coroner is qualified to testify that violent behavior increases during periods of drug use. "Nothing in the record indicates

what kind of testimony [he] could have provided. Establishing that would require proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal." *State v. Madrigal*, 87 Ohio St.3d 378, 390–391, 721 N.E.2d 52, 65 (2000) (rejecting claim of ineffectiveness for counsel's failure to utilize an expert on eyewitness identification); *State v. Carter*, 89 Ohio St.3d 593, 606, 734 N.E.2d 345, 357(2000) (rejecting claim of ineffectiveness for counsel's failure to pursue MRI testing in the penalty phase). There is nothing in the record from which we can determine whether such evidence would have been favorable to Watson and caused the outcome of the trial to be different. *State v. Coleman,* 45 Ohio St.2d 298, 307-308, 544 N.E.2d 622(1989).

**{¶37}** However, even assuming arguendo counsel's failure to cross-examine the coroner concerning the decedent's drug usage reflected deficient performance, Watson cannot establish prejudice under *Strickland.* We note that the jury heard evidence of the drugs in T.B.'s system at the time of his death. 2T. at 211-212. The jury further heard testimony that drugs make individuals more agitated from trial counsel's cross-examination of Officer Aynes. 2T. at 73. Additionally, the jury was able to observe the decedent and Watson in real time on the motel's video surveillance footage.

**{¶38}** Thus, Watson has not shown that there was a reasonable probability that, but for counsel's error, the result of his trial would have been different.

### Failure to mount an effective self-defense theory

**{¶39}** Watson argues that his trial counsel did not comply with Crim. R. 12.2. Watson argues that the trial court's refusal to allow J.J. to testify to the prior violent

acts of T.B. that he witnessed was because his trial counsel failed to comply with Crim. R. 12.2.

{¶40} Crim. R. 12.2. states in pertinent part:

Whenever a defendant in a criminal case proposes to offer evidence or argue self-defense, defense of another, or defense of that person's residence, the defendant shall, not less than thirty days before trial in a felony case and fourteen days before trial in a misdemeanor case, give notice in writing of such intent. The notice shall include specific information as to any prior incidents or circumstances upon which defendant intends to offer evidence related to conduct of the alleged victim, and the names and addresses of any witness's defendant may call at trial to offer testimony related to the defense. If the defendant fails to file such written notice, the court may exclude evidence offered by the defendant related to the defense, unless the court determines that in the interest of justice such evidence should be admitted.

{¶41} Prior to the start of trial, the trial judge addressed the state's motion in limine to exclude bad acts testimony concerning the decedent. 1T. at 207. The judge did not mention Crim.R. 12.2; rather, the focus of the discussion was Evid. R. 404 and 405. Id. at 213. The court permitted both counsel to further research the issue.

{¶42} The trial judge addressed the issue again after the state had rested its case. 3T. at 39. During this discussion the trial judge does review Crim.R. 12.2. Id. at 42. The

judge indicated that he would not allow the testimony under Evid.R. 404 and also because of the lack of compliance with Crim.R. 12.2. Id. at 50-51.

**{¶43}** J.J.'s name was provided to the state in both the defendant's witness list filed September 21, 2022 and the updated witness list filed September 23, 2022.

**{¶44}** We note that Crim R. 12.2 is a rule of *procedure*, not a rule of *evidence*. The rule requires only that the defense notify the state of evidence that the defense may offer in support of his self-defense claim. It does not appear to this Court to make the evidence admissible at trial, per se. Whether any particular piece of evidence is admissible at trial would be determined by the Rules of Evidence, not the Rules of Criminal Procedure. In the case at bar, the trial court also ruled the testimony of J.J. inadmissible under Evid. R. 404 and 405.

**{¶45}** Even if counsel's failure to comply with Crim R. 12.2 reflected deficient performance, Watson has failed to establish prejudice under *Strickland.*

**{¶46}** The trial judge did permit Watson to present his self-defense case to the jury and further instructed the jury on the issue of self-defense. The jury heard Watson himself testify concerning the prior violent acts of T.B. and how they affected him. Further, the jury was able to view the actors and their actions in real time via the surveillance videos. Watson fails to elucidate how J.J.'s corroboration of the instances of T.B.'s conduct would have led the jury to find Watson not guilty of murder.

**{¶47}** Thus, Watson has not shown that there was a reasonable probability that, but for J.J.'s testimony, the result of his trial would have been different.

**Failure to attend significant court proceedings**

{¶48} Watson next argues that his lead counsel was ineffective because co-counsel attended the arraignment and pre-trial conferences. We find, however, that argument to lack merit. We note that co-counsel also represented Watson, along with lead counsel, during Watson's jury trial. Watson was represented by competent counsel at all stages of the case. Watson has not shown that there was a reasonable probability that, but for lead counsel's failure to personally attend pre-trial conferences, the result of his trial would have been different.

**Failure to sever the weapons under disability charge from the remaining charges**

{¶49} Watson argues trial counsel was ineffective in not asking to have the Having Weapons While under Disability charge severed and tried separately by the trial judge. Watson contends because of trial counsel's inaction, the jury heard about Watson's prior felony record which could have been avoided. He argues that such evidence clearly prejudiced Watson as the jury learned he was a convicted felon.

{¶50} Prior to voir dire, trial counsel stipulated to Watson's prior conviction in 2009 for possession of cocaine and, also stipulated to the operability of the firearm. 1T. at 7; 4T. at 52.

{¶51} A defendant has no constitutional right to determine trial tactics and strategy of counsel. *State v. Cowans*, 87 Ohio St.3d 68, 72, 717 N.E.2d 298(1999); *State v. Conway,* 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 150; *State v. Donkers,* 170 Ohio App.3d 509, 867 N.E.2d 903, 2007-Ohio-1557, ¶ 183(11th Dist.). Rather, decisions about viable defenses are the exclusive domain of defense counsel after

consulting with the defendant. Id.  When there is no demonstration that counsel failed to research the facts or the law or that counsel was ignorant of a crucial defense, a reviewing court defers to counsel's judgment in the matter.  *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189(1980), citing *People v. Miller*, 7 Cal.3d 562, 573-574, 102 Cal.Rptr. 841, 498 P.2d 1089(1972); *State v. Wiley*, 10th Dist. No. 03AP-340, 2004-Ohio-1008 at ¶ 21. Even if the wisdom of an approach is questionable, "debatable trial tactics" do not constitute ineffective assistance of counsel.  Id. "Poor tactics of experienced counsel, however, even with disastrous result, may hardly be considered lack of due process * * *." *State v. Clayton*, 62 Ohio St.2d 45, 48, 402 N.E.2d 1189 (1980) (*quoting United States v. Denno,* 313 F.2d 364 (2nd Cir.1963), *certiorari denied* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143.

{¶52}  As part of his defense, Watson explained to the jury why he left the scene after he shot T.B.  Watson testified during his trial that he left the scene and did not stay to speak to the police after the shooting because he was not permitted to have a firearm. Thus, counsel may have made a tactical decision to allow the jury to hear that Watson had a 12-year-old conviction for possessing cocaine rather than leaving the jury to speculate as to a more nefarious reason why he could not possess a weapon.

{¶53}  In light of the overwhelming evidence of Watson's guilt, we find that even if counsel's failure to have the charges severed for trial reflected deficient performance, Watson has failed to establish prejudice under *Strickland.*  Watson has not shown that there was a reasonable probability that, but for the jury being aware of his prior conviction for possession of cocaine, the jury would have found him not guilty of murder.

**Failure to object to testimony from law enforcement regarding search warrants**

{¶54} Watson suggests that search warrants required a neutral judge to decide sufficient probable cause to demonstrate that a search was warranted for a crime that occurred. Allowing the investigating police officers to testify that they had obtained search warrants for T.B.'s room and Watson's room at the Rodeway Inn essentially told that jury that Watson was involved with a murder thereby destroying his presumption of innocence. Therefore, Watson submits, his trial counsel's failure to object to this testimony and request a limiting instruction amounted to ineffective assistance.

{¶55} "'The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.'" *State v. Fears*, 86 Ohio St.3d 329, 347, 715 N.E.2d 136 (1999), *quoting State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988). A defendant must also show that he was materially prejudiced by the failure to object. *Holloway*, 38 Ohio St.3d at 244, 527 N.E.2d 831. *Accord, State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 233.

{¶56} It is unlikely that the trial judge would have prevented the testimony even if counsel had objected. The testimony merely informed the jury about the protocol the police used to investigate the crime. The jury was informed that the police legally and properly searched the rooms during the investigation. Watson never denied shooting T.B. Watson never denied having the gun used to shoot T.B. Watson was arrested for shooting T.B. Thus, the jury could infer that Watson was involved with a crime, even a murder, without the evidence relating to the search warrants.

**{¶57}** In any event, the presumption of innocence was fully explained in the voir dire and the jury instructions. *See, State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 75. "[J]uries are presumed to follow their instructions." *Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). "A presumption always exists that the jury has followed the instructions given to it by the trial court," *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313(1990), at paragraph four of the syllabus, *rehearing denied*, 54 Ohio St.3d 716, 562 N.E.2d 163, *approving and following State v. Fox*, 133 Ohio St. 154, 12 N.E.2d 413(1938); *Browning v. State*, 120 Ohio St. 62, 165 N.E. 566(1929).

**{¶58}** Even if counsel's failure to object to testimony concerning the police obtaining search warrants could be construed as deficit performance, Watson has failed to establish prejudice under *Strickland.* Watson has not shown that there was a reasonable probability that, but for the testimony concerning the search warrants, the result of his trial would have been different.

**Failure to object to testimony from law enforcement that Watson was in jail or request a limiting instruction**

**{¶59}** Watson next argues that trial counsel failed to object or request a curative instruction when Detective McDannold testified he collected Watson's DNA from Watson at the Stark County Jail. Watson contends that the fact that he was in jail destroyed the presumption of innocence in the eyes of the jury.

**{¶60}** We note that the detective's testimony concerning jail was not solicited by the prosecutor. The statement was isolated and occurred when the detective was explaining his collection of the evidence and the chain of custody. 2T. at 147. The

evidence that Watson was in jail related solely to when Watson's DNA was collected by the detective and does not convey that Watson was in jail from the time of his arrest to the time of trial.

**{¶61}** The failure to request a curative instruction may have been a tactical decision by counsel to avoid calling additional attention to the statement which, in and of itself, created no prejudice to Watson in light of the totality of the evidence adduced. In addition, the presumption of innocence was fully explained in the voir dire and the jury instructions. *See, State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 75.

**{¶62}** Even if counsel's failure to object reflected deficient performance, Watson has failed to establish prejudice under *Strickland.* Watson has not shown that there was a reasonable probability that, but for the jury being aware that he was in jail at the time the detective collected his DNA, the result of his trial would have been different.

**Failure to request an expert witness to testify to the effect of drugs found in the T.B.'s system**

**{¶63}** Watson suggests that an expert opinion and testimony that discussed the effects of the drugs taken by T.B. on his demeanor and violent words and actions would have substantially supported Watson's theory of self-defense.

**{¶64}** "Nothing in the record indicates what kind of testimony an * * * expert could have provided. Establishing that would require proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal." *State v. Madrigal*, 87 Ohio St.3d 378, 390–391, 721 N.E.2d 52, 65 (2000) (rejecting claim of ineffectiveness for counsel's failure to utilize an expert on

eyewitness identification); *State v. Carter*, 89 Ohio St.3d 593, 606, 734 N.E.2d 345, 357(2000) (rejecting claim of ineffectiveness for counsel's failure to pursue MRI testing in the penalty phase). There is nothing in the record from which we can determine whether such evidence would have been favorable to Watson and caused the outcome of the trial to be different. *State v. Coleman,* 45 Ohio St.2d 298, 307-308, 544 N.E.2d 622(1989). Further, the jury was able to view the actors and their actions before, during, and after the shooting in real time via the surveillance videos.

{¶65} Thus, we reject Watson's claim that counsel's failure to request an expert to testify to the effect of drugs found in the victim's system constituted ineffective assistance of counsel.

### Disrespect of the trial court judge in front of the jury

{¶66} Watson contends that animosity and disrespect of Watson's trial counsel to the court was viewed by the jury. However, Watson cites to only the following as evidence in support of his claim,

> THE COURT: Hey counsel, you're starting to repeat yourself over and over.
>
> [DEFENSE COUNSEL]: I'm sorry, Judge
>
> THE COURT: That's okay. Its closing argument.
>
> [DEFENSE COUNSEL]: I - - I don't want – I don't want you to be angry with me.
>
> THE COURT: I'm not angry one bit. I'm just doing my job as judge.
>
> [DEFENSE COUNSEL]: I don't want you think [sic.] I'm –
>
> THE COURT: That's all.

[DEFENSE COUNSEL]: I don't want you to think I'm screwing up.  I want to - -

[THE COURT]:  I'm not saying anyone is screwing up.  I just said- -

[DEFENSE COUNSEL]:  I want to meet the court's expectations.  I'll move on.

THE COURT:  Wait.  Wait a minute.  Let's have a sidebar.

4T. at 92.  The remaining exchange occurred outside the hearing of the jury.  Id.  Watson cites to no other place in the record to support his assertion that defense counsel displayed animosity and disrespect toward the trial judge.

**{¶67}** Even if counsel's attitude and remarks reflected deficient performance, which we do not find to be the case, Watson has failed to establish prejudice under *Strickland.*  Watson has not shown that there was a reasonable probability that, but for the exchange between the judge and defense counsel, the result of his trial would have been different.

**Cumulative errors**

**{¶68}**  Watson contends all of these issues collectively amounted to cumulative error.

**{¶69}**  In State *v. Brown*, 100 Ohio St.3d 51, 2003–Ohio–5059, 796 N.E.2d 506, the Ohio Supreme Court recognized the doctrine of cumulative error.  However, as explained in *State v. Bethel*, 110 Ohio St.3d 416, 2006–Ohio–4853, 854 N.E.2d 150, ¶197, it is simply not enough to intone the phrase "cumulative error." *State v. Sapp*, 105 Ohio St.3d 104, 2004–Ohio–7008, 822 N.E.2d 1239, ¶103.

{¶70} Watson cites the doctrine of cumulative error, lists, or incorporates the previous assignments of error, and gives no analysis or explanation as to why or how the errors have had a prejudicial cumulative effect. Thus, this assignment of error has no substance under *Bethel* and *Sapp*.

{¶71} Further, where we have found that the trial court did not err, cumulative error is simply inapplicable. *State v. Carter*, 5th Dist. Stark No.2002CA00125, 2003–Ohio-1313 at ¶37. To the extent that we have found that any claimed error of the trial court was harmless, or that claimed error did not rise to the level of plain error, we conclude that the cumulative effect of such claimed errors is also harmless because taken together, they did not materially affect the verdict. *State v. Leonard*, 104 Ohio St.3d 54, 89–90, 2004–Ohio–6235, 818 N.E.2d 229, 270 at ¶ 185.

{¶72} Watson's First Assignment of Error is overruled.

II.

{¶73} In his Second Assignment of Error, Watson argues that the manifest weight of the evidence supports that he acted in self-defense when he shot T.B.

**Standard of Appellate Review – Manifest Weight**

{¶74} The state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal. *State v. Messenger,* Slip Op. No. 2022-Ohio-4562, ¶27.

{¶75} As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as*

*stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355*; *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

**{¶76}** Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, *supra,* 78 Ohio St.3d at 386-387, 678 N.E.2d 541(1997), *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶83. When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Thompkins* at 387, 678 N.E.2d 541, *citing Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652(1982) (quotation marks omitted); *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1244, ¶25, citing *Thompkins.* As one Court has explained,

> When faced with a manifest weight of the evidence challenge, we must consider whether the state "carried its burden of persuasion" before the trial court. *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 26; *see State v. Martin*, Slip Opinion No. 2022-Ohio-4175, ¶ 26. Unlike the burden of production, which concerns a party's duty to introduce enough evidence on an issue, the burden of persuasion represents a party's duty to convince the factfinder to view the facts in his or her favor. *Messenger* at ¶ 17. Therefore, in order for us to conclude that the factfinder's adjudication of conflicting evidence ran counter to the manifest weight of the evidence— which we reserve for only the most exceptional circumstances—we must find that the factfinder disregarded or overlooked compelling evidence that weighed against conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387-

388, 678 N.E.2d 541 (1997). We accordingly sit as a "thirteenth juror" in this respect. Id.

*State v. Gibson*, 1st Dist. Hamilton No. C-220283, 2023-Ohio-1640, ¶ 8.

**{¶77}** Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). The Ohio Supreme Court has emphasized: "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.'" *Eastley v. Volkman,* 132 Ohio St.3d 328, 334, 972 N.E.2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978).

**{¶78}** Further, to reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, *citing Thompkins* at paragraph four of the syllabus.

**Issue for Appellate Review**: *Whether the jury clearly lost their way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered*

**{¶79}** Watson was convicted of felony murder pursuant to R. C. 2903.02(B) which provides that "[no] person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

**{¶80}** When an accused asserts the defense of self-defense he does not seek to negate any of the elements of the offense which the state is required to prove. Self-defense is not merely a denial or contradiction of evidence offered by the state to prove the essential elements of the charged crime. Rather, it is an admission of the prohibited conduct coupled with a claim that the surrounding facts or circumstances exempt the accused from liability therefor— "justification for admitted conduct." *State v. Poole*, 33 Ohio St.2d 18, 294 N.E.2d 888 (1973).

**{¶81}** In order to determine the respective duties with respect to a self-defense claim, we must turn to R.C. 2901.05(B)(1),

> (B)(1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

**{¶82}** Under R.C. 2901.05(B)(1) there are two burdens. *State v. Davidson-Dixon*, 8th Dist. Cuyahoga No. 109557, 2021-Ohio-1485, ¶ 18. The defendant has the initial burden of production, which is the burden of producing evidence "that tends to support" that the defendant used the force in self-defense. *State v. Messenger,* Slip Op. 2022-Ohio-4462, 2022 WL 17824346, ¶ 21. The burden then shifts to the state under its burden of persuasion to prove beyond a reasonable doubt that the defendant did not use the force in self-defense. Id. at ¶ 24. In other words, if the evidence tends to support that the defendant acted in self-defense, then the prosecution must prove beyond a reasonable doubt that the defendant did not act in self-defense. R.C. 2901.05(B)(1); Id. at ¶26; *State v. Gatewood,* 1st Dist. Hamilton No. C-190654, 2021-Ohio-3325, ¶ 68. The state need only disprove one of the elements of self-defense beyond a reasonable doubt at trial to sustain its burden. *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893(1986). *Accord, State v. Carney,* 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶31; *State v. Staats,* 5th Dist. Stark No. 2019CA00181, ¶ 28.

**{¶83}** At the close of Watson's jury trial, the trial court provided the jury with an instruction regarding self-defense, which means that the trial court concluded that the record contained evidence that tends to support that Watson used the force in self-defense when he shot and killed T.B. R.C. 2901.05(B)(1). *State v. Messenger,* Slip Op. 2022-Ohio-4462, 2022 WL 17824346, ¶ 26. The guilty verdict means that the state met its burden of persuading the jury beyond a reasonable doubt that Watson was not acting in self-defense when he killed T.B. Id.

**{¶84}** When deadly force is used, the elements of self-defense that the state must now disprove at least one of are: (1) Watson was not at fault in creating the situation

giving rise to the affray, (2) Watson had reasonable grounds to believe and an honest belief even if mistaken that he was in imminent danger of death or great bodily harm and that he did not use more force than necessary to defend against the attack and (3) Watson must not have violated any duty to retreat or avoid the danger.  *State v. Robbins*, 58 Ohio St.2d 74, 79, 388 N.E.2d 755 (1979) (citations omitted); *See also, State v. Barker*, 2nd Dist. Montgomery, 2022-Ohio-3756, 199 N.E.3d 626, ¶27; *State v. Evans,* 8th Dist. Cuyahoga No. 79895, 2002-Ohio-2610, 2002 WL 1041745, ¶ 53; *State v. Hamilton*, 12th Dist. Butler No. CA2001-04-098, 2002-Ohio-3862, 2002 WL 1758358, ¶17.

{¶85}  As to the third element of self-defense, we note that the trial court instructed the jury in accordance with the recently amended "stand your ground" law in Ohio. 4T. at 44.  That law now indicates that "a person has no duty to retreat before using self-defense * * * if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B); *State v. Messenger,* Slip Op. 2022-Ohio-4462, 2022 WL 17824346, ¶10. "'Simply put, the new 'stand your ground' law removes, in most cases, the duty to retreat before using self-defense.'" *State v. Degahson,* 2nd Dist. Clark No. 2021-CA-35, 2022-Ohio-2972, ¶ 15.  *State v. Mitchell*, 1st Dist. Hamilton No. C-220471, 2023-Ohio-2604, ¶ 17; *State v. Robinette,* 5th Dist. Stark No 2021 CA 00124, 2023-Ohio-5, 205 N.E.3d 633, ¶51.

{¶86}  The second element of self-defense "is a combined subjective and objective test."  *State v. Thomas*, 77 Ohio St.3d 323, 330, 673 N.E.2d 1339 (1997).  The person's belief must be objectively reasonable under the circumstances and he must subjectively believe he needed to resort to force to defend himself or the other person.  Id. at 330–331, 673 N.E.2d 1339.

"The objective part of the test requires consideration of 'whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack,' a reasonable person would believe that danger was imminent." *State v. Hendrickson*, 4th Dist. No. 08CA12, 2009-Ohio-4416, 2009 WL 2682158, ¶ 30, *quoting State v. Keith*, 10th Dist. Franklin Nos. 08AP–28, 08AP–29, 2008-Ohio-6122, ¶ 23*, citing Thomas*, 77 Ohio St.3d at 330, 673 N.E.2d 1339. The subjective part requires consideration of whether the defendant himself actually believed that he was in imminent danger. Id.

*State v. Bundy,* 4th Dist. Pike No. 11 CA 818, 2012-Ohio-3934, ¶54; *Accord, State v. Wilson,* 1st Dist. Hamilton No. C-210535, 2022-Ohio-3801, ¶13.

{¶87} Here, the evidence does not support that Watson possessed the necessary objective and subjective beliefs he was in imminent or immediate danger of death or great bodily harm. Generally, neither words alone nor fear itself will constitute evidence of serious provocation. "[W]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *State v. Shane,* 63 Ohio St.3d 630, 634-45, 590 N.E.2d 272 (1992)." Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack,* 82 Ohio St.3d 198, 201, 694 N.E.2d 1328. Cases have held that a victim's simple pushing or punching does not constitute sufficient provocation to incite the use of deadly force in most situations. See, *State v. Koballa,* 8th Dist. Cuyahoga No. 82013, 2003-Ohio-3535 (concluding that sufficient provocation did not exist when the victim grabbed the defendant by the testicles and the arm); *State v. Poe* 4th Dist. Jackson No. 00CA9, 2000-

Ohio-1966 (concluding that the victim's conduct in approaching the defendant with a hammer and stating "come on" did not constitute sufficient provocation).  *State v. Pack*, 4th Dist. Pike No. 93CA525, 1994 WL 274429(June 20, 1994) ("We find that a mere shove and a swing (which appellant by his own testimony ducked) are insufficient as a matter of law to constitute serious provocation reasonably sufficient to incite or arouse appellant into using deadly force.").  Although stated in terms of provocation, we find the same analysis would apply to whether a defendant, by reason of the actions of the victim, possessed the necessary objective and subjective beliefs he was in imminent or immediate danger of death or great bodily harm.  *State v. Becker,* 5th Dist. Stark No. 2022 CA 0069, 2023-Ohio-601, ¶27.

**{¶88}**  Implicit in the second element of self-defense is the requirement that the degree of force used was warranted under the circumstances and proportionate to the perceived threat.  *State v. Kean*, 10th Dist. Franklin No. 17AP-427, 2019-Ohio-1171, ¶ 58.  As to the degree of force that is permitted, the defendant is privileged to use the amount of force that is reasonably necessary to repel the attack.  *State v. Williford*, 49 Ohio St. 3d 247, 551 N.E.2d 1279 (1990).  In other words, one may use a commensurate amount of force as the circumstances require to protect oneself against an attack.  *Akron v. Dokes*, 31 Ohio App.3d 24, 25, 507 N.E.2d 1158 (9th Dist. 1986).

**{¶89}**  Watson testified to only verbal threats made by T.B. prior to Watson's use of deadly force.  The video evidence shows T.B. was shirtless, unarmed, and was backing up with his arms raised, hands empty, when Watson appears to step forward towards T.B., while pulling out his pistol from his waistband, and shot T.B.  The video evidence shows that T.B. did not charge Watson; did not raise a fist to Watson; and that T.B. was

not within arm's reach of Watson. Even setting aside the question of who the aggressor was, Watson testified that T.B. did not have any sort of weapon in his hands at any time during the altercation. If Watson's fear was only of physical harm, he was allowed by law only to use an amount of force that was warranted under the circumstances and proportionate to the perceived threat. Watson's decision to shoot T.B. was deadly force and was disproportionate to the threat he faced under these circumstances.

{¶90} While Watson was free to argue that he was justified in using deadly force, and the trial court instructed the jury accordingly, the jury may have chosen to discredit his testimony. The jury saw Watson and all the witnesses subjected to cross-examination. The jury also reviewed the Rodeway surveillance video, Best Western surveillance video, and the video from the Benjamin Transportation Company showing the events as they happened in real time.

{¶91} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crimes for which Watson was convicted. We further find there is substantial evidence proving beyond a reasonable doubt that Watson was not acting in self-defense when he killed T.B., and further, the degree of force used by Watson was unwarranted under the circumstances and disproportionate to the perceived threat. Therefore, in light of the evidence discussed above, as well as the record in its entirety, we do not find the jury clearly lost its way concluding that Watson murdered T.B. and that he was not acting in self-defense. We do not find that the jury disregarded or overlooked compelling evidence that weighed against conviction.

{¶92} Watson's Second Assignment of Error is overruled.

III.

{¶93}  In his Third Assignment of Error, Watson contends that there is insufficient evidence to support his conviction for tampering with evidence; further he argues the conviction is against the manifest weight of the evidence.

{¶94}  Watson argues that the state based its theory of tampering with evidence on the discovery of the Ruger pistol in Room 215.  He claims, however, that the video evidence and the testimony of law enforcement do not support the finding that Watson attempted to conceal the weapon.  It was found in plain view under the air conditioner and/or a chair.  It was not thrown in a waste basket or hidden in a drawer.

**Standard of Appellate Review– Sufficiency of the Evidence.**

{¶95}  The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...."  This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt.  *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013); *Hurst v. Florida*, 577 U.S. 92, 136 S.Ct. 616, 621, 193 L.Ed.2d 504 (2016).  The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court.  *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶30.  "This naturally entails a review of the elements of the charged offense and a review of the state's evidence."  *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶13.

{¶96}  When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed.  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by State constitutional*

*amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997)*; *Walker*, 150 Ohio St.3d at ¶30. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. *State v. Poutney*, 153 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶19. Thus, "on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001), *quoting Jenks* at paragraph two of the syllabus; *Walker* 150 Ohio St.3d at ¶31. We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997); *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶74.

**Issue for Appellate Review**: *Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, if believed, would convince the average mind that Watson was guilty beyond a reasonable doubt of Tampering with Evidence*

{¶97} R.C. 2921.12(A)(1) provides that "no person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"

{¶98} Thus, to prove tampering with evidence, the state had to prove that Watson (1) had knowledge that an official proceeding or investigation was in progress or likely to be instituted; (2) altered, destroyed, concealed, or removed the potential evidence; and (3) for the purpose of impairing the potential evidence's availability or value in such proceeding or investigation. *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 11. A conviction for tampering with evidence pursuant to R.C. 2921.12(A)(1) requires proof that the defendant intended to impair the value or availability of evidence that related to an existing or likely official investigation or proceeding. Likelihood is measured at the time of the act of alleged tampering. *Straley*, ¶19.

{¶99} T.B. and his girlfriend rented Room 309; Room 223 was rented by K.C., Watson's girlfriend. 2T. at 94, 122. Detective Shanklin reviewed the security footage and noted the shooting occurred in front of Room 215. 2T. at 90-91. Because he saw people go into that room after the shooting, he obtained a search warrant for that room. Detective Shanklin searched Room 215 and found a Ruger silver/black pistol under the air conditioning unit and/or a chair.

{¶100} Watson knew the police were arriving. He did not give the pistol to the police or direct the police to where the pistol he had used to shoot T.B. could be found. Watson fled the scene leaving the pistol behind. Watson did not leave the pistol on the bed or the desk; rather he removed the pistol from his waistband, placed it inside a room that he was not associated with, and placed it behind a chair, and underneath the wall mounted air conditioning unit. The jury could infer that he did so in an attempt to prevent the police from locating it. The jury was able to view a photograph of exactly where the pistol was placed when it was discovered by the police. 2T. at 100; State's Exhibit 1-P.

{¶101} Viewing the evidence in the case at bar in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Watson knowing the police were investigating the shooting death of T.B. concealed, or removed the potential evidence for the purpose of impairing the potential evidence's availability or value in such investigation.

{¶102} We hold, therefore, that the state met its burden of production regarding each element of the crime of tampering with evidence and, accordingly, there was sufficient evidence to submit the charge to the jury and to support Watson's conviction.

## Standard of Appellate Review – Manifest Weight

{¶103} As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355*; *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

{¶104} Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, *supra,* 78 Ohio St.3d at 386-387, 678 N.E.2d 541(1997), *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶83. When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Thompkins* at 387, 678 N.E.2d 541, *citing Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652(1982)

(quotation marks omitted); *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1244, ¶25, citing *Thompkins.* As one Court has explained,

> When faced with a manifest weight of the evidence challenge, we must consider whether the state "carried its burden of persuasion" before the trial court. *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 26; *see State v. Martin*, Slip Opinion No. 2022-Ohio-4175, ¶ 26. Unlike the burden of production, which concerns a party's duty to introduce enough evidence on an issue, the burden of persuasion represents a party's duty to convince the factfinder to view the facts in his or her favor. *Messenger* at ¶ 17. Therefore, in order for us to conclude that the factfinder's adjudication of conflicting evidence ran counter to the manifest weight of the evidence—which we reserve for only the most exceptional circumstances—we must find that the factfinder disregarded or overlooked compelling evidence that weighed against conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387-388, 678 N.E.2d 541 (1997). We accordingly sit as a "thirteenth juror" in this   respect. Id.

*State v. Gibson*, 1st Dist. Hamilton No. C-220283, 2023-Ohio-1640, ¶ 8.

{¶105} Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). The Ohio Supreme Court has emphasized: "'[I]n determining whether the

judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.'" *Eastley v. Volkman,* 132 Ohio St.3d 328, 334, 972 N.E.2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978).

{¶106} Further, to reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, *citing Thompkins* at paragraph four of the syllabus.

**Issue for Appellate Review**: *Whether the jury clearly lost their way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.*

{¶107} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based upon the entire record in this matter we find Watson's conviction for tampering with evidence is not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Watson's guilt.

{¶108} Upon review of the entire record, weighing the evidence and all reasonable inferences as a thirteenth juror, including considering the credibility of witnesses, we

cannot reach the conclusion that the trier of facts lost its way and created a manifest miscarriage of justice. We do not find the jury erred when it found Watson guilty. Taken as a whole, the testimony and record contain ample evidence of Watson's responsibility for the crime of tampering with evidence. The jury was able to observe the witnesses, including Watson, testify subject to cross-examination. The jury was able to view a photograph of exactly where the pistol was placed when it was discovered by the police. 2T. at 100; State's Exhibit 1-P.

{¶109} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crime of tampering with evidence for which Watson was convicted. We do not find that the jury disregarded or overlooked compelling evidence that weighed against conviction.

{¶110} Watson's Third Assignment of Error is overruled.

## IV.

{¶111} In his Fourth Assignment of Error, Watson argues that the trial judge violated his right to present a meaningful defense by excluding the testimony of J.J. Specifically, Watson argues that J.J.'s testimony was admissible because it would support his self-defense claim in that it would corroborate why Watson believed T.B. would kill or severely injure him.

### Standard of Appellate Review

{¶112} "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991).

**Issue for Appellate Review:**  *Whether the trial court violated Watson's right to present a meaningful defense by excluding the testimony of a defense witness concerning specific acts of the decedent*

{¶113} Every criminal defendant has a constitutional right to present a meaningful defense.  *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). A defendant has an absolute right to prepare an adequate defense under the Sixth Amendment of the United States Constitution and a right to due process under the Fifth and Fourteenth Amendments.  *United States v. Crossley*, 224 F.3d 847, 854 (6th Cir. 2000).  The United States Supreme Court has recognized that the right to offer the testimony of witnesses and compel their attendance is constitutionally protected. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). The Ohio Supreme Court recognized that the right to present a witness to establish a defense is a fundamental element of due process of law.  *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 4–5, 511 N.E.2d 1138 (1987).

{¶114} As we noted in our disposition of Watson's First Assignment of Error, the trial judge did permit Watson to present his self-defense case to the jury and further instructed the jury on the issue of self-defense.  The jury heard Watson himself testify concerning the prior violent acts of T.B. and how they affected him.  Further, the jury was able to view the actors and their actions in real time via the surveillance videos.

{¶115} Assuming arguendo that the trial judge erred in excluding the testimony of J.J., we would still find no reversible error.  Where, as here, the defendant has objected to a claimed error in the trial court, an appellate court reviews error under a harmless

error standard set forth in Crim.R. 52(A). *State v. Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15.

**{¶116}** Crim.R. 52(A) defines harmless error in the context of criminal cases and provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under the harmless-error standard of review, "the government bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." *State v. Perry*, 101 Ohio St.3d 118, 2004–Ohio–297, 802 N.E.2d 643, ¶ 15, *citing United States v. Olano*, 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). An appellate court is required to reverse the conviction when the state is unable to meet its burden. *Perry* at ¶ 15. *See, also, State v. West*, 168 Ohio St.3d 605, 2022-Ohio-1556, 200 N.E.3d 1048, ¶ 22.

**{¶117}** The following analysis was established to guide appellate courts in determining whether an error has affected the substantial rights of a defendant, thereby requiring a new trial. First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. *State v. Morris*, 141 Ohio St.3d 399, 2014–Ohio–5052, 24 N.E.3d 1153, ¶ 25 and 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. Id. at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. Id. at ¶ 29, 33. *See also, State v. Harris,* 142 Ohio St.3d 211, 2015–Ohio–166, 28 N.E.3d 1256, ¶ 36–37.

**{¶118}** The jury heard the evidence of T.B.'s prior encounters with Watson from Watson himself. J.J. was not present when Watson shot T.B. At best, J.J.'s testimony

corroborates Watson's testimony concerning the prior encounters with T.B. As we noted in our disposition of Watson's Second Assignment of Error, the video evidence and the testimony establish beyond a reasonable doubt that Watson was not acting in self-defense at the time that he shot T.B. and further, the degree of force used by Watson was unwarranted under the circumstances and disproportionate to the perceived threat. We therefore find that the exclusion of J.J.'s testimony did not change the result of the trial and had no impact on the verdict. The exclusion of J.J.'s testimony, if error, was harmless beyond a reasonable doubt.

{¶119} Further we find that even if we consider J.J.'s testimony, the testimony does not overcome the overwhelming evidence that supports the finding that Watson did not possess the necessary objective and subjective beliefs he was in imminent or immediate danger of death or great bodily harm at the time he shot T.B. and further, that the degree of force used by Watson was unwarranted under the circumstances and disproportionate to the perceived threat.

{¶120} Watson's Fourth Assignment of Error is overruled.

{¶121} The judgment of the Stark County Court of Common Pleas is affirmed.

By Gwin, P.J.,

Hoffman, J., and

King, J., concur