[Cite as *State v. Frank*, 2024-Ohio-3098.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. Patricia A. Delaney, P.J.<br>Hon. William B. Hoffman, J.<br>Hon. Craig R. Baldwin, J. |
| Plaintiff-Appellee | |
| -vs- | Case No. 2023CA00108 |
| ERROL G. FRANK, III | |
| Defendant-Appellant | O P I N I O N |

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Appeal from the Stark County Court of Common Pleas, Case No. 2023CR0721 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | August 15, 2024 |

APPEARANCES:

For Plaintiff-Appellee

KYLE L. STONE
Prosecuting Attorney
Stark County, Ohio

VICKI L. DeSANTIS
Assistant Prosecuting Attorney
Appellate Division
110 Central Plaza South, Suite 510
Canton, Ohio 44702-1413

For Defendant-Appellant

EDWARD R. La RUE
323 Lakeside Avenue, Suite 210
Cleveland, Ohio 44113

*Hoffman, J.*

{¶1} Defendant-appellant Errol G. Frank, III, appeals his convictions and sentence entered by the Stark County Court of Common Pleas on two counts of murder, one count of felonious assault, one count of tampering with evidence, and three three-year firearm specifications, following a jury trial. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE CASE AND FACTS

{¶2} On May 18, 2023, the Stark County Grand Jury indicted Appellant on one count of murder, in violation of R.C. 2903.02(A), an unspecified felony, with an attendant three-year firearm specification; one count of murder, in violation of R.C. 2903.03(B), an unspecified felony, with an attendant three-year firearm specification; one count of felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree; and one count of tampering with evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree. Appellant appeared for arraignment on May 19, 2023, and entered a plea of not guilty to the Indictment.

{¶3} On May 24, 2023, Appellant executed a limited waiver of his right to a speedy trial. Trial was scheduled for July 25, 2023. Appellant filed a motion for pre-trial release, which the trial court denied. Prior to trial, Appellant filed a notice of self-defense.

{¶4} The matter proceeded to jury trial on July 25, 2023. The following evidence was presented at trial:

{¶5} At approximately 3:00 p.m. on March 22, 2023, Patrolman Trent Abel with the City of Canton Police Department and his partner, Officer Stern, were dispatched to the area of 851 Rowland Avenue, NE, in response to a shooting. The officers arrived at the scene and encountered a group of people standing at the corner of The O'Jays Parkway, NE, and Peel Place, NE. As Patrolman Abel exited his cruiser, he observed

the victim laying on his back, facing west. Patrolman Abel noticed the victim, whose head and face were covered in blood, had "a bullet wound his forehead area." Trial Transcript, Vol. I, p. 129.

**{¶6}** Patrolman Abel wrapped the victim's head with a compression bandage and applied pressure to the wound. As Patrolman Abel checked the victim for other injuries, he observed a bullet hole, which appeared to be an exit wound, in the victim's abdomen area. Medics arrived and transported the victim to the hospital.

**{¶7}** Patrolman Abel searched the area for evidence and located some of the victim's personal property, a bag containing an unknown white substance, and one spent shell casing. Patrolman Abel maintained security of the area while detectives and the ID Bureau processed the scene.

**{¶8}** Paul George, a retired United Methodist pastor, testified he was a volunteer at his church, and on March 22, 2023, was driving a church van on the southwest side of Canton, picking up youth to take them to church. George, his wife, and four youths were traveling just north of 9th Street, when they heard what sounded like a gunshot. George could not ascertain the direction from which the sound had come.

**{¶9}** As George tried to determine what was happening, he observed two male individuals sprinting out of a grassy knoll. George recalled, "At first we thought somebody just fired a shot in the air and everyone's clearing, but as they went across the street, when they hit this alley, the first man fell and you can see the other one was chasing him." Tr. at p. 143. The first male fell face first, then turned around with his hands up. George stated the second male had something in his hand. He heard two more gunshots and the first male "collapsed down on his face." Tr. at p. 145. George called 9-1-1. After ensuring

the male with the gun had cleared the area, George went to check on the victim.  Another man had reached the victim first and turned the victim onto his back. George noticed the victim had a gunshot wound "[r]ight in the middle of the forehead." Tr. at p. 148.

{¶10} George indicated the shooter was wearing a hat or had dreadlocks, was approximately 6'0" or 6'1" tall, and held the gun in his right hand. He described the victim as African-American, a little heavier built, and not wearing shoes.  George estimated the shooter was eight (8) feet away from the victim.

{¶11} Detective Daniel Szaniszlo with the City of Canton Police Department testified, on March 22, 2023, at approximately 5:00 p.m., he received a call from Lieutenant Talkington, asking him to assist in the homicide investigation.  Upon his arrival at the scene, officers briefed Detective Szaniszlo.  He learned the victim was Melvin Stevenson, he had suffered several gunshot wounds, and had succumbed to those injuries. Detective Szaniszlo also learned the suspect was a black male with what was described as dreadlocks.  After running Stevenson through police databases, Detective Szaniszlo discovered Stevenson had been married to a Tricia Stevenson, who had changed her name to Tricia Frank. Through a Facebook search, the detective discovered Tricia Frank was newly married to an individual identifying himself as "Young Veteran." A picture in Young Veteran's Facebook profile matched the description of the suspect. Young Veteran was subsequently identified as Appellant.

{¶12} With this information, detectives obtained video footage from city street cameras and the video cameras they were able to locate.  Detectives learned Appellant drove a silver Mazda van. Video footage from the city street cameras revealed a silver Mazda van in the area of the shooting.  Detectives ran the license plate of the silver Mazda

van and discovered the vehicle was registered to Appellant. The Critical Response Team began surveillance in the area of Appellant's residence. When Appellant and Tricia Frank left their home, officers effected a stop of their vehicle. Appellant and Tricia Frank were transported to police headquarters. Detectives Szaniszlo and Romanin executed a search warrant on Appellant's residence.

{¶13} Vincent Romanin, a detective with the City of Canton Police Department, testified he responded to the scene after hearing the radio call dispatching patrol units to a shooting incident. Upon his arrival, paramedics were placing the victim onto a gurney and transporting him to the hospital. Detective Romanin conferred with patrol officers, who identified two witnesses. The detective briefly interviewed the witnesses at the scene, and spoke with Paul George a second time at the police department.

{¶14} Detective Romanin explained how he and other investigators identified Appellant as the suspect. Investigators learned Appellant drove a silver Mazda MPV, a van style vehicle. Upon reviewing video footage from the area near the time of the incident, a Mazda MPV is observed on camera leaving the area immediately after the incident. Detective Romanin was able to confirm the Mazda MPV on the video was registered to Appellant. He and other investigators consulted with the Coordinated Response Team ("the CRT"), which then attempted to locate the vehicle. The CRT was unable to locate the Mazda MPV, but, upon checking an address associated with Appellant, observed a vehicle which was registered to Tricia Frank. The CRT conducted surveillance on the residence. After two individuals entered the vehicle registered to Tricia Frank and drove away from the residence, a member of CRT initiated a traffic stop of the vehicle. The occupants of the vehicle were Appellant and Tricia Frank. Appellant

and Tricia Frank were transported to Canton Police Department, where they were interviewed by Detective Romanin.

{¶15} Detective Romanin summarized his interview with Appellant, noting Appellant was not forthcoming and untruthful about what had occurred. Appellant told Detective Romanin he had received a phone call from Tricia Frank, during which Tricia Frank told Appellant she had observed Stevenson.  Tricia Frank gave Appellant Stevenson's specific location and a description of the clothes he was wearing.  Appellant then went in search of Stevenson.  Appellant initially observed Stevenson walking on 12th Street, near Nimisila Park.  Appellant drove around the area until he was able to intercept Stevenson.  Appellant explained a confrontation ensued during which he discharged a firearm into Stevenson.  Appellant left the area, returned home, and told Tricia Frank what had occurred.  Detective Romanin stated Stevenson was traveling a couple of miles away from Appellant's neighborhood, in the opposite direction.  During the interview, Appellant told Detective Romanin he was scared for his wife and daughter, but not for himself.

{¶16}  While the video of Detective Romanin's interview with Appellant was played for the jury, Detective Romanin explained the inconsistencies in Appellant's responses, adding Appellant's statements did not make sense or were not supported by the information the police had gathered. Video footage of Stevenson walking with his arms swinging by his sides in the area prior to the shooting was played for the jury. Contrary to statements made by Appellant during the interview, Stevenson was not carrying a bag and did not have his hands in his pockets.

{¶17}  Detective Romanin testified he collected cell phones belonging to Appellant and Tricia Frank and reviewed the contents of the phones for communications, call logs,

text messages, and FaceChat messages.  Detective Romanin indicated there were several communications between Appellant and Tricia Frank on March 22, 2023, to wit: a phone call placed by Tricia Frank to Appellant at 2:46 p.m., which lasted 15 minutes; a cancelled call at 3:00 p.m.; and a FaceTime video call at 3:01 p.m., which lasted 7 minutes.  Neither Appellant's phone nor Tricia Frank's phone revealed any communications from Stevenson.

{¶18}  In addition to Paul George, Detective Romanin spoke with another witness, Ivan Toe, who lived in the immediate vicinity of the shooting.  Toe heard a commotion outside, then gunshots.  When Toe went outside to find out what was happening, he observed the suspect running southbound away from the area.

{¶19}  City of Canton Police Officer Randy Weirich, an evidence technician in the crime scene unit, testified he was dispatched to Appellant's residence to photograph and collect evidence. In the garage, Officer Weirich collected a Taurus pistol, model 709, with one round in the chamber and another round in the magazine, which was located in a clear plastic bag in a rain gutter, and a Blink camera. Officer Wierich photographed the silver Mazda van.  Inside the home, Officer Weirich collected the following evidence: a Ring door camera, a Ring doorbell, two black t-shirts, a pair of black pants, a pair of black jeans,[1] a round of 9 mm ammunition, a Phoenix Raven .25 automatic pistol, a small plastic bag containing a substance subsequently identified as marijuana, and Appellant and Tricia Frank's driver's licenses. Officer Weirich responded to the hospital and collected the bullet removed from Stevenson's body.  During his testimony, Officer Weirich identified State's Exhibits 1, 1A, 1B, 3, 7-11, 13, and 15A-F, which included the physical

---

[1] All of the clothing was found in a washing machine.

evidence recovered during the search of Appellant's residence as well as the photographs he took during the search.

{¶20} Abigail Ilievski, a firearms and fingerprint analyst with the Canton/Stark County Crime Lab, performed ballistics testing on the 9 mm Taurus firearm recovered during the search of Appellant's residence. Ilievski explained she fired the Taurus then compared the test-fire bullet to the spent cartridge found at the scene. Ilievski opined the spent cartridge found at the scene was fired from the Taurus firearm.

{¶21} Larry Mackey, also a firearms and fingerprint analysist with the Canton/Stark County Crime Lab, examined the black hooded sweatshirt Stevenson was wearing at the time of his murder. Through testing for gunpowder residue, gases, and other particles, Mackey estimated the Taurus was fired from a distance of 5 to 6 feet away from Stevenson. Mackey was able to rule out a near contact shot with the muzzle as the fabric was not burned. Mackey explained how he determines whether a defect in fabric caused by a bullet is an entrance defect or an exit defect. Mackey testified the defect on the front of the sweatshirt was an exit defect, while the defect on the back of the sweatshirt was an entrance defect.

{¶22} Magdalena Davis testified she was at home at approximately 3 p.m. on March 22, 2023. Davis recalled she was in her bedroom, smoking a cigarette out an open window and talking on the phone to her oldest daughter, when she heard two or three gunshots. Davis immediately ducked down. When the gunshots stopped, Davis stood and looked out the window. She observed "some bigger guy running like in slow motion and towards * * * Peel Street * * * then he falls over" on his back. Transcript of Proceedings, Vol. II, p. 350. Davis watched as "the other guy walked around him on his

left side and stood in front of him and shot him a couple more times." *Id.* The shooter left the area. Davis screamed to her other daughter, who was at home with her, to call 9-1-1. Police arrived shortly thereafter. Davis went to the police station and gave a statement. Davis stated the shooter and the victim were both black men.

**{¶23}** Cuyahoga County Medical Examiner Dr. Alison Krywanczyk testified she personally performed the autopsy on Stevenson's body. Dr. Krywanczyk noted the Cuyahoga County Medical Examiner's Office has a contract with Stark County to conduct autopsies on behalf of Stark County. During her external examination, Dr. Krywanczyk observed two types of injuries on Stevenson, to wit: gunshot wounds and blunt force injuries. Stevenson "had several blunt force injuries on his face; so over his forehead, over his nose which were all very consistent with what we would call collapse-type injury," which occurs when "someone falls either because they're unconscious or becoming unconscious" and do not have the ability to catch themselves. Tr. Vol. II, p. 367.

**{¶24}** The first gunshot wound Dr. Krywanczyk examined entered Stevenson's left frontal scalp and exited his upper lip. This gunshot wound had a downward trajectory, traveling through the skull, the left frontal lobe of the brain, passing through the base of the skull behind the left eye, then the maxilla of the mouth, and finally exiting the upper lip. Dr. Krywanczyk stated this gunshot wound, "in and of itself," could have been fatal. *Id.* at p. 370.

**{¶25}** The second gunshot wound Dr. Krywanczyk examined entered the left side of Stevenson's back and exited the right side of his abdomen. Dr. Krywanczyk testified her examination of the body in this area was limited due to the surgeries performed in an attempt to save Stevenson's life. Stevenson's spleen and half of his pancreas had been

removed; therefore, Dr. Krywanczyk could not assess the injuries to those organs. The medical examiner was able to determine this gunshot wound passed through the diaphragm, the liver, the stomach, and part of the intestine before exiting. The gunshot wound had a flat trajectory. Dr. Krywanczyk stated the victim could have walked or run after receiving this gunshot wound.

{¶26} Dr. Krywanczyk determined the cause of Stevenson's death was gunshot wounds. She forwarded her report to the Stark County Coroner, who ruled the manner of death a homicide.

{¶27} Upon conclusion of Dr. Krywanczyk's testimony, the State rested its case.

{¶28} Appellant testified on his own behalf. Appellant explained Stevenson was his wife Tricia Frank's ex-husband. Appellant and his wife had been married for almost a year, and Tricia Frank had been divorced from Stevenson for approximately the same amount of time. Appellant recalled Stevenson made two calls to Tricia Frank. Stevenson made the first call from prison. During the call, Stevenson repeated Appellant and Tricia Frank's address over and over. A few months later, Stevenson called from a private number, demanding, "Come out you bitch ass n-----, I'm outside your house." Tr. Vol. II, p. 386. Appellant and Tricia Frank sought and received a protection order in July, 2022, following Stevenson's first call. Appellant acknowledged Stevenson sent two non-threatening texts to Tricia Frank, asking for his CashApp information.

{¶29} On the day of the shooting, Appellant received a phone call from Tricia Frank, who was hysterical and crying. Tricia Frank told Appellant she saw Stevenson walking on 12th Street. Appellant testified he was driving home at the time. He stopped at his residence and retrieved his gun. Appellant returned to the area where Tricia Frank

stated she saw Stevenson.  While he was driving, Appellant observed an individual crossing the street near Nimisilla Park.  Appellant stated he was not sure the individual was Stevenson because Tricia Frank's description did not match.  Appellant turned around "with the pure intentions to actually see if this was Melvin Stevenson, and if it was, * * * [he] just wanted to have a man-to-man conversation to see if [they] could come up with some type of solution."  Tr. Vol. II, p. 388.  Appellant exited his vehicle and called Stevenson's name.  The individual turned around, which confirmed to Appellant it was, in fact, Stevenson.  Appellant returned to his vehicle, drove to Lippert Street, parked, and exited the vehicle for a second time.

{¶30} Appellant crossed the street and approached Stevenson, who started talking about an apartment building. Appellant noted he was wearing a Covid mask at the time, but the mask fell off, and Stevenson's demeanor changed once he recognized Appellant.  Appellant testified Stevenson "lunged at [him] and attacked [him]." Tr. Vol. II, p. 420.  Appellant stated, during the attack, he heard two loud pops.  Appellant admitted he did not see a gun in Stevenson's hand.  As Appellant reached for his gun, Stevenson started to run.  Appellant gave chase.  According to Appellant, during the chase, Stevenson put his arm back and Appellant heard another loud pop. Appellant then shot at Stevenson.  Appellant alleged Stevenson came at him with his arms out. Appellant then fired another shot. After Appellant heard Stevenson hit the ground, he retrieved his gun, ran to his vehicle, and drove home.

{¶31} Appellant indicated he did not intend to kill Stevenson, but only wanted to talk to him "to see if [they could] come up with a solution * * * and [Appellant] and [his] wife [didn't] have to continue to live in fear." Tr. Vol. II, p. 392.  Appellant denied tracking

down Stevenson, but acknowledged the City camera video footage shown during the trial depicts him driving his vehicle, turning onto different streets, following Stevenson. Appellant admitted he lied to Detective Romanin when he told the detective he was walking to a friend's house when he encountered Stevenson.  Appellant further acknowledged he lied to Detective Romanin about throwing away the gun. Appellant did not tell Detective Romanin Stevenson had a gun and had shot at him.

**{¶32}** Appellant did not call any other witnesses. Defense counsel rested its case.

**{¶33}** After hearing all the evidence and deliberating, the jury found Appellant guilty of all of the counts contained in the Indictment.  At sentencing, the trial court merged Counts Two (murder, in violations of R.C. 2903.02(B)) and Three (felonious assault) for sentencing purposes and sentenced Appellant to an aggregate prison term of twenty (20) years to life.

**{¶34}** It is from his convictions and sentence Appellant appeals, raising the following assignments of error:


I. THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY TO DISREGARD ITS INSTRUCTION ON WITNESS CREDIBILITY BECAUSE THE APPELLANT HAD EXERCISED HIS CONSTITUTIONAL RIGHT TO TESTIFY AT TRIAL. (TR. P. 473).

II. BECAUSE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, APPELLANT'S CONVICTIONS MUST BE REVERSED AND REMANDED. (TR. P. PASSIM).

III. BECAUSE THE PROSECUTOR COMMITTED MISCONDUCT BY IMPROPERLY ARGUING THAT APPELLANT WAS ABLE TO CRAFT HIS TESTIMONY TO THE EVIDENCE PRESENTED TO THE JURY BY ATTENDING TRIAL, APPELLANT'S CONVICTIONS SHOULD BE REVERSED. (TR. P. 501-503).

IV. BECAUSE DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO OBJECT TO THE TRIAL COURT ERRONEOUSLY INSTRUCTING THE JURY TO DISREGARD A CRITICAL JURY INSTRUCTION ON WITNESS CREDIBILITY, APPELLANT'S CONVICTIONS SHOULD BE REVERSED. (TR. P. 473).

I, IV

**{¶35}** Because Appellant's first and fourth assignments of error require similar analysis, we elect to address said assignments of error together. In his first assignment of error, Appellant contends the trial court's erroneous jury instruction was structural error. In his fourth assignment of error, Appellant claims his trial counsel was ineffective for failing to object to the trial court's erroneous jury instruction.

**{¶36}** Pertinent to our analysis and disposition of Appellant's first and fourth assignments of error is the following portion of the trial court's charge to the jury:

THE COURT: You are the sole judges of the facts, the credibility of the witnesses and the weight of the evidence.

To weigh the evidence, you must consider the credibility of the witnesses. You will apply the tests of truthfulness which you do in your daily lives. It includes the appearance of each witness on the stand, their manner of testifying, the reasonableness of the testimony, the opportunity they had to see, hear and know the things they're testifying to, accuracy of memory, frankness or lack of it, intelligence, interest and bias, if any; together with all these facts and circumstances surrounding the testimony. Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.

You are not required to believe the testimony of any witness simply because they were under oath. You may believe or disbelieve all or part of the testimony of any witness. It is your province to determine what testimony is worthy of belief and what is not worthy of belief.

You should not decide any issue of fact merely on the basis of the number of witnesses who testify on each side of the issue. Rather, the final test in judging evidence should be the force and weight of the evidence regardless of the number of witnesses on each side of the issue.

The testimony of one witness believed by you is sufficient to prove any fact. Also, discrepancies in a witness's testimony or between his testimony and that of others, if there are any, does not necessarily mean you should disbelieve the witness, as people commonly forget facts and recollect them erroneously after the passage of time.

You are certainly all aware of the fact that two people who are witnesses to an incident often see or hear them differently. In considering a discrepancy in a witness' testimony, you should consider whether the discrepancy concerns an important fact or a trivial one.

If you conclude the witness lied in their testimony as to the material fact, you may distrust all of their testimony and you would then have the right to reject all of their testimony unless, from all the evidence, you believe that the probability of truth favors their testimony in other particulars.

*The last paragraph does not apply because [Appellant] did take the witness stand.*

Transcript of Proceedings, Vol. II, pp. 470 – 473. (Emphasis added.)


*Structural Error Analysis*

**{¶37}** Appellant asserts "the Trial Court committed structural error when it erroneously instructed the jury to disregard a proper jury instruction on witness credibility, 'because the defendant did take the witness stand (tr. p. 473).' " Brief of Appellant at p. 8. Appellant explains, "This case was based solely on witness credibility. The Defendant conceded that he caused the death of the deceased; there were no forensic issues that were critical to the jury's decision making, and thus, witness credibility was all important to case at bar." *Id.* Appellant adds the trial court did not give any other instruction on witness credibility.

**{¶38}** Structural errors are "constitutional defects that defy analysis by 'harmless error' standards because they affect[ ] the framework within which the trial proceeds,

rather than simply [being] an error in the trial process itself." (Internal quotations omitted.) *State v. Perry*, 2004-Ohio-297, ¶ 17, quoting *State v. Fisher*, 2003-Ohio-2761, ¶ 9, quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-310 (1991). Such errors permeate "[t]he entire conduct of the trial from beginning to end so that the trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." (Internal quotations and citations omitted.) *Id.*

**{¶39}** This Court has held the "[f]ailure to properly instruct a jury is not in most instances structural error, thus the harmless-error rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) applies; failure to properly instruct the jury does not necessarily render a trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *State v. Swint*, 2022-Ohio-976, ¶ 72 (5th Dist.), citing *State v. Bleigh,* 2010-Ohio-1182, ¶ 119 (5th Dist.), citing *Neder v. United States*, 527 U.S. 1 (1999).

**{¶40}** The State claims "[t]he trial court * * * read the jury instructions [prepared prior to Appellant's decision to testify], but when the trial court got to the last paragraph, it realized the paragraph about the defendant not having to testify was still present in the instructions, so the court merely told the jury to disregard that paragraph." Brief of Appellee at p. 19. The State concludes, "[t]he trial court was not instructing the jury to disregard the instruction" relative to witness credibility. *Id.* Although the State's explanation may very well be accurate, we find nothing in the record before us to definitively confirm the jury understood the "last paragraph" which "does not apply" referred to an instruction which had not been read to them.

**{¶41}** Thus, the question on review is whether the given instructions and the trial court's subsequent statement, "The last paragraph does not apply because [Appellant]

did take the witness stand," were so confusing such that they affected Appellant's substantial rights or contributed to his conviction. See, *State v. Jackson*, 22 Ohio St.3d 281, 285 (1986), citing Crim.R. 52(A). While the trial court's instruction to disregard the last paragraph of the jury instructions addressing witness credibility was an inadvertent mistake (error), we find the given instruction and the trial court's statement did not affect Appellant's substantial rights or contribute to his convictions. We conclude there was no structural error in this case. *See State v. Whitman*, 2018-Ohio-2924, ¶ 63 (5th Dist.). We have thoroughly reviewed the extensive record in this matter, including a thorough reading of the entire trial transcript, and find the jury did not lose its way and the trial court's mistaken instruction was harmless.

*Ineffective Assistance of Counsel*

**{¶42}** Appellant submits trial counsel was ineffective for failing to object to the aforementioned statement by the trial court.

**{¶43}** A properly licensed attorney is presumed competent. *State v. Hamblin*, 37 Ohio St.3d 153 (1988). In order to prevail on a claim of ineffective assistance of counsel, an appellant must show counsel's performance fell below an objective standard of reasonable representation and, but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989). In other words, an appellant must show counsel's conduct so undermined the proper functioning of the adversarial process the proceedings cannot be relied upon as having produced a just result. *Id.* In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. *Bradley* at 142. Because of the

difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists counsel's conduct fell within the wide range of reasonable professional assistance. *Id.*

**{¶44}** In order to warrant a reversal, an appellant must additionally show he was prejudiced by counsel's ineffectiveness. "Prejudice from defective representation sufficient to justify reversal of a conviction exists only where the result of the trial was unreliable or the proceeding fundamentally unfair because of the performance of trial counsel." *State v. Carter*, 72 Ohio St.3d 545 (1995), citing *Lockhart v. Fretwell*, 506 U.S. 364, 370 (1993). The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley* at 143, quoting *Strickland* at 697.

**{¶45}** Having already found the trial court's statement did not affect Appellant's substantial rights or contribute to his conviction, Appellant is unable to establish he was prejudiced by trial counsel's failure to object to the trial court's statement, "The last paragraph does not apply because [Appellant] did take the witness stand." Therefore, Appellant cannot prevail on his claim of ineffective assistance of counsel.

**{¶46}** Appellant's first and fourth assignments of error are overruled.

II

**{¶47}** In his second assignment of error, Appellant argues his convictions were against the manifest weight of the evidence as the State failed to prove he did not act in self-defense. We disagree.

**{¶48}** The State's burden of disproving a defendant's claim of self-defense beyond a reasonable doubt is subject to a manifest weight review on appeal. *State v. Watson*, 2023-Ohio-3137, ¶ 74 (5th Dist.), citing *State v. Messenger*, 2022-Ohio-4562, ¶ 27. When conducting a manifest weight review, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

**{¶49}** When an accused asserts the defense of self-defense, he does not seek to negate any of the elements of the offense which the State is required to prove. Self-defense is an admission of the prohibited conduct coupled with a claim the surrounding facts or circumstances exempt the accused from liability; therefore, "justification for admitted conduct." *Watson*, 2023-Ohio-3137, ¶ 80, citing *State v. Poole*, 33 Ohio St.2d 18 (1973).

**{¶50}** "The elements of self-defense differ depending on whether the defendant used deadly or non-deadly force to defend himself." *State v. Eddy*, 2022-Ohio-3965, ¶ 14 (3rd Dist.), quoting *State v. Bagley*, 2014-Ohio-1787, ¶ 15 (3rd Dist.). "The use of a gun constitutes the use of deadly force." *State v. Dale*, 2013-Ohio-2229, ¶ 15 (2nd Dist.).

**{¶51}** R.C. 2901.05(B)(1) provides:

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

R.C. 2901.05(B)(1).

**{¶52}** Thus, the current version of R.C. 2901.05(B)(1) requires the State to disprove self-defense by proving beyond a reasonable doubt the accused: "(1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger." *State v. Messenger*, 2021-Ohio-2044, ¶ 36 (10th Dist.).

**{¶53}** Appellant maintains the trier of fact lost its way in rejecting his claim of self-defense as such was supported "by all of the scientific, forensic, and medical evidence." Brief of Appellant at p. 17. It is well settled "a conviction is not against the manifest weight of the evidence simply because the [trier of fact] rejected the defendant's version of the facts and believed the testimony presented by the state." (Internal citations omitted.) *State v. Jallah*, 2015-Ohio-1950, ¶ 71 (8th Dist.), quoting *State v. Hall*, 2014-Ohio-2959, ¶ 28 (4th Dist.). The trier of fact is free to believe all, some, or none of the evidence presented

by the State or defense at trial. *State v. Smith*, 2010-Ohio-4006, ¶ 16 (8th Dist.). We cannot conclude the jury lost its way.

**{¶54}** First, the evidence supports the conclusion Appellant created the situation giving rise to the affray. At trial, Appellant testified Stevenson "lunged at [him] and attacked [him]." Tr. Vol. II, p. 420. Appellant stated, during the attack, he heard two loud pops, so he reached for his gun. Appellant admitted he did not see a gun in Stevenson's hand. Stevenson ran away and Appellant gave chase. Appellant claimed, as he was chasing Stevenson, Stevenson put his arm back and Appellant heard another loud pop. Appellant then shot at Stevenson. In contrast, during his interview with Detective Romanin, which was played for the jury, Appellant did not tell the detective Stevenson was in possession of a gun or Stevenson had fired the first shot. Rather, Appellant admitted Stevenson lunged at him and he "just started firing." Tr. Vol. I, p. 39.

**{¶55}** Further, the record establishes Appellant did not have reasonable grounds to believe he was in imminent or immediate danger of death or great bodily harm. Generally, neither words alone nor fear itself will constitute evidence of serious provocation. "[W]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *State v. Shane,* 63 Ohio St.3d 630, 634 (1992). "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack,* 82 Ohio St.3d 198, 201 (1998).

**{¶56}** At trial, Appellant explained, after determining Stevenson was the individual he saw near Nimisilla Park, he "drove around just out of protection of myself because I don't – didn't know what he have or what he could do, and I didn't want to risk driving literally past him and he did something." Tr. Vol. II, pp. 389-390. However, during his

interview with Detective Romanin, Appellant indicated, "I was scared for my wife and my daughter. I wasn't scared for me." Tr., Vol. I, p. 39. There was simply no evidence at trial to support Appellant's assertion he believed he was in imminent or immediate danger of death or great bodily harm.

{¶57}  Finally, the evidence supports the finding Appellant's use of a gun was not reasonably necessary under the circumstances. *State v. Huguley*, 2017-Ohio-8300, ¶ 35 (9th Dist.); *State v. Terry*, 2023-Ohio-2074, ¶ 15 (1st Dist.), quoting *State v. Johnson*, 2009-Ohio-3500, ¶ 12 (6th Dist.). ("[T]he use of deadly force in self-defense must be reasonably proportionate—self-defense 'is not available unless the defendant shows that the force used to repel the danger was not more than the situation reasonably demanded.' "). The evidence at trial revealed Stevenson was not in possession of a firearm at the time of the shooting and Appellant acknowledged he did not see Stevenson with a firearm.  In addition, witnesses stated Stevenson had his arms up and his hands were empty.

{¶58}  In addition, Dr. Krywanczyk testified the first gunshot she examined entered Stevenson's left frontal scalp and exited his upper lip with a downward trajectory, indicating Stevenson was below Appellant when he was shot.  The second gunshot wound Dr. Krywanczyk examined entered the left side of Stevenson's back and exited the right side of his abdomen, indicating Stevenson was faced away from Appellant.

{¶59}  Appellant initiated the contact with Stevenson and willingly engaged in a physical altercation with someone he subjectively claimed possessed a weapon. "Generally, a defendant, having willingly advanced toward a volatile situation cannot rely on the affirmative defense of self-defense." *State v. Walker*, 2021-Ohio-2037, ¶ 19 (8th Dist.).

{¶60}  Also, of significance, is the fact Appellant chased Stevenson after Appellant claims to have heard two loud pops.  Appellant then shot Stevenson in the forehead as Stevenson laid on the ground. Clearly, Appellant's active pursuit of Stevenson after the initial confrontation supports the State's argument Appellant also violated his duty to retreat or avoid the danger.

{¶61}  Based upon the foregoing, we find the State disproved Appellant's claim of self-defense by proving beyond a reasonable doubt Appellant was at fault in creating the situation giving rise to the affray, did not have a bona fide belief he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, and he violated a duty to retreat or avoid the danger. Accordingly, we find Appellant's convictions were not against the manifest weight of the evidence.

{¶62}  Appellant's second assignment of error is overruled.

III

{¶63} Appellant withdrew his third assignment of error at oral argument in this matter on July 9, 2024. Accordingly, Appellant's third assignment of error is overruled.

{¶64} The judgment of the Stark County Court of Common Pleas is affirmed.

By: Hoffman, J.

Delaney, P.J. and

Baldwin, J. concur